IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IFS FINANCIAL CORPORATION | § | CASE NO. 02-39553-H1-7 |
| Debtor | § | |
| W. STEVE SMITH, TRUSTEE OF THE ESTATES OF IFS FINANCIAL CORPORATION, ET AL. | § | |
| Plaintiff | § | ADVERSARY NO. |
| VS. | § | |
| JOHN BRUNO JACUZZI RAINIERI | § | |
| Defendant | § | |

**TRUSTEE'S COMPLAINT AGAINST JOHN BRUNO JACUZZI RAINIERI**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

COMES NOW, W. Steve Smith, Trustee ("Trustee") of the Estates of IFS Financial Corporation ("IFS") and INV Capital, Ltd. ("INV"), and files this Complaint against John Bruno Jacuzzi Rainieri ("Jacuzzi"), respectfully showing as follows:

**I.**

**JURISDICTION**

**A.   Federal Question**

1.   This adversary proceeding relates to the above referenced bankruptcy cases filed under Chapter 7 of the United States Bankruptcy Code. Jurisdiction is proper pursuant to 28 U.S.C. § 1334. Jurisdiction is also proper pursuant to 11 U.S.C. §§ 544 and 550.

**B.      Diversity of Citizenship and Amount**

2.      Trustee is a citizen of the State of Texas, United States of America. Jacuzzi is an individual, a citizen of Mexico, with place of residence located in Mexico. Jacuzzi does not have an agent in the State of Texas for purposes of service of process acceptance. The amount in controversy exceeds $75,000.00, exclusive of costs and interest. Jurisdiction is proper pursuant to 28 U.S.C. § 1332.

**C.      Consent to and/or Minimum Contacts**

3.      Trustee's cause of action arises out of investments in the United States and repayments originating from business operations in the United States. As will be detailed hereinbelow, the Interamericas Corporate Structure (the "Interamericas Companies"), which included the Debtor, named above, accepted investments, deposits and loans, primarily from Mexico and Switzerland, which, in the years in question, ended up in Southwest Bank of Texas, Houston, Texas ("SWBOT"), and/or Woodforest National Bank, Houston, Texas ("Woodforest"), and was utilized in the operations of the Interamericas Companies in the United States, most, if not all, of which were then located in Texas. The money used to repay these investments, deposits and loans came primarily from the proceeds realized from the sale of IFS' insurance and mortgage operations, all of which was paid out of the SWBOT accounts and Woodforest account. Finally, Navarro conspired with principals of the Interamericas to convert property of Debtor and to denude Debtor and to defraud their creditors in the United States. Sufficient business/commitment of torts exist to support jurisdiction under Federal long-arm service (Fed. R. Civ. P. 4(k)(2)) and State long-arm service (Tex. Rev. Civ. Prac. & Rem. Code § 17.041, et seq.)

## II.

## VENUE

4.	This adversary proceeding relates to the above referenced bankruptcy proceedings pending in this Court.  Venue is proper pursuant to 28 U.S.C. §

## III.

## PARTIES

5.	Trustee is the Trustee of the following cases pending in this Court:

| | |
|---|---|
| IFS FINANCIAL CORPORATION, | CASE NO. 02-39553-H1-7 |
| INTERAMERICAS, LTD., | CASE NO. 04-34519-H1-7 |
| INTERAMERICAS INVESTMENTS, LTD., | CASE NO. 04-34520-H1-7 |
| INTERAMERICAS HOLDINGS, INC., | CASE NO. 04-34521-H1-7 |
| INTERAMERICAS FINANCIAL HOLDINGS, LTD., | CASE NO. 04-34522-H1-7 |
| INTERAMERICAS FINANCIAL HOLDINGS CORP., | CASE NO. 04-34523-H1-7 |
| INTERAMERICAS CORPORATION, | CASE NO. 04-34524-H1-7 |
| AMPER INTERNATIONAL, LTD., | CASE NO. 04-34525-H1-7 |
| AMPER LTD., | CASE NO. 04-34526-H1-7 |
| INV CAPITAL, LTD., | CASE NO. 04-34527-H1-7 |
| INV SERVICES, LTD., | CASE NO. 04-34528-H1-7 |
| ORBOST, LTD., | CASE NO. 04-34529-H1-7 |
| MP CORP., | CASE NO. 04-34530-H1-7 |
| CIRCLE INVESTORS, INC., | CASE NO. 04-34514-H1-7 |
| COMSTAR MORTGAGE CORPORATION, | CASE NO. 04-34515-H1-7 |
| IFS INSURANCE HOLDINGS CORPORATION, | CASE NO. 04-34516-H1-7 |
| INTERSTAR INVESTMENT CORP. | CASE NO. 04-34517-H1-7 |

A chart of the Interamericas Corporate Structure and description of affiliated companies' relationships is as follows:



---

[1.] Interamericas Corporation owned other, inactive subsidiaries, which are not diagrammed here.

[2.] Enrique Pimienta, a major "player" in the Interamericas scheme, held 2%.

[3.] There are inconsistencies in the ownership of IFS. Hugo Pimienta is/was a substantial stockholder, possibly even a major stockholder.

[4.] IFS Financial Corporation owned other, mostly inactive, subsidiaries not diagrammed.

[5.] The mortgage business of AccuBanc was sold in 1999 and the name of AccuBanc changed to Comstar. The approximate $50 million realized from that sale was fraudulently transferred.

[6.] The insurance operation, American Founders Life ("AFL"), was owned by Securus Financial Corp, a wholly owned subsidiary of Circle, which subsidiary merged with American Founders Financial Corporation ("AFFC"). AFFC paid for its acquisition by what was purported to be $49.5 million in cash and $50 million of AFFC preferred stock. The cash and proceeds realized from preferred stock redemption were fraudulently transferred.

4

The "business" of Interamericas, Ltd., Interamericas Investments, Ltd., Interamericas Financial Holdings, Ltd., Interamericas Financial Holdings Corp., Interamericas Holdings, Inc. and Interamericas Corporation was holding the stock of their respective subsidiaries. None really generated any meaningful income, if any. The holding structure was Cayman until Mexico removed the Cayman Islands as acceptable offshore investment vehicles. At that point Ireland still being on the accepted list, the holding structure added an Irish grandparent, Interamericas, Ltd. Amper International, Ltd. and Amper, Ltd. (collectively "Amper") served as the conduit through which many loans, many of which were nothing more than fraudulent transfers described as loans to third parties, were made and funded out of the account of either INV or Integra Bank at SWBOT. Integra Bank, now in receivership in Curacao, Netherland Antilles and INV Capital, Ltd. (Irish) and INV Services, Ltd. (Cayman) (collectively "INV") served as conduits for receipts of loans or investments into the SWBOT, allegedly obtaining and holding for the investor/lender alleged certificates of deposits, promissory notes, EuroNotes and other forms of indebtedness, in some cases obligating one or more of the Interamericas Companies. All of the proceeds from sale of the insurance and mortgage operations were deposited in the Integra account at SWBOT and some of these proceeds used to "purchase" EuroNotes, which, as found by Judge Rosenthal (in a case hereinafter discussed), were nothing more than shams and an intentional fraud to defeat her injunction prohibiting IFS from the transfer of assets. Orbost was created to hold/pass through money for or to certain insiders.

6.     Jacuzzi is an individual residing in Mexico. His address is Calle de los Rosales #365, Col. Santa Engracia, San Pedro Garza, Neuvo Leon, Mexico 66267.

## IV.

## OVERVIEW

7. Trouble began for the Interamericas Companies when one group of investors headed by Jorge Hollander, GCM Corporation Limited ("GCM"), broke off from the remainder of the group headed by Hugo Pimienta ("Pimienta"). For its interests and investments in the Interamericas Companies, Interamericas Financial Holdings Corporation ("Financial Holdings") issued a note. Through subsequent transactions, IFS replaced Financial Holdings as the note obligor and Blitz Holding Corp. ("Blitz") replaced GCM as the note payee. That note is presently at approximately $74 million principal.

8. In violation of certain covenants, Pimienta and other insiders began the total denuding of IFS and its operating subsidiaries which owned the insurance and mortgage operations which constituted the then total business operations of the Interamericas Companies.

9. Beginning in mid to late 1998, over $40 million was loaned out from the insurance subsidiary, AFL, to stockholders and officers, and family members thereof, of Interamericas Companies and to other insiders of or investors in the Interamericas Companies (the "Select Asset Loans"). IFS and its subsidiaries paid over $17 million to service the Select Asset Loans.

In addition to the Select Asset Loans, Insurance Holdings made a separate loan to North Sea Corp., a U.S. Corporation owned by or established for the benefit of Gonzalo Romero Matias ("Romero"), the majority interest holder in the Interamericas Companies and affiliates, on June 22, 1999 of $5 million secured by $5.3 million promissory note of

6

Palatina, S.A. de C.V. to Romero and by stock of Flaminia, S.A. de C.V. (Judge Rosenthal ordered the turnover to IFS of this note and collateral by her Order of August 16, 2002 in Civ. No. H-00-2247). Further, IFS purportedly made unsecured loans to South Sea Corp. (another Romero U.S. Company) of $13 million on or about March 15, 2000 and to Larce, Inc. (another Romero Company) of $3 million on or about March 15, 2000 for which IFS was issued promissory notes, ordered turned over by Judge Rosenthal.

10. In November of 1999, IFS entered into an agreement to sell the AccuBanc Mortgage ("Accubanc") name and its prime book of business to National City Mortgage Co. for approximately $30 million. That sale closed and funded on December 1, 1999 and the money was deposited into the Integra account at SWBOT. It subsequently sold its sub prime mortgage book to GMAC Mortgage Corporation, ("GMAC"), Household Financial Services, Inc. ("HFS") and PNC Mortgage Corporation of America ("PNC"). These sales provided for installment payments to Comstar. Approximately $15 million was paid, some of which went to AFFC on the Select Assets Loans. However, GMAC, HFS and PNC retained offset rights for non-performing mortgages acquired and ultimately those mortgages were charged back against the balances remaining, creating claims back against Comstar, the successor to AccuBanc.

11. In late 1999, the IFS subsidiary owning AFL, Securus Financial Corporation ("Securus"), merged with an entity owned by Wayne A. Schreck and Ken Phillips, the officers theretofore in charge of AFL's insurance operations, and became AFFC. In exchange, Securus' parent, Circle, then Insurance Holdings, then IFS as the result of

7

dividending up, were to receive approximately $49.5 million in cash and $50 million of Class A preferred stock, which assured virtual control.

12. Of the $49.5 million in cash to be paid at closing in January 2000, Circle/IFS received only $22,727,219.41 after paying, among other items, $2,245,136.60 past due on the Select Asset Loans and $2,388,976.33 as additional collateral for the Luis Mendez Jimenez Select Asset Loan. Thereafter, on May 23, 2000, AFFC first redeemed the stock, acquiring 20,000 shares of Series A preferred stock and replacing the 30,000 share balance of preferred A stock with 30,000 shares of Class C stock for an illusory $22 million in cash. By substitution of the Class C stock, the control retained by Circle/IFS was extinguished. After payment of a debt owing by Comstar, of $4.2 million on the Select Asset Loans, and other debts due to AFFC, plus a redemption fee, $12,736,957 was issued to redeem the stock under the first redemption. On November 6, 2000, AFFC redeemed 21,000 shares of the Class C stock for $7 million, of which $3.25 million was held back for the Select Asset Loans. On September 12, 2001, the third and final redemption purportedly occurred. The redemption price of $4,851,000 was retained and applied to the Select Asset Loans. However, AFFC separately advanced $350,000 to Pimienta (less $54,180.01 applied to the Mustang Athletic Club (a company owned by Arturo Pimienta) debt to AFL).

13. In January of 2000, IFS paid down the Blitz note by approximately $30 million. The balance of the money from the AccuBanc and AFL sales and stock redemptions and from other assets were loaned to insiders, e.g. Larce and South Sea, or invested in another Pimienta company, Pueblo Corporation, now in bankruptcy. Over $60 million was outright transferred to insiders. Jacuzzi received $512,000.00 ($50,000.00 on 7/31/00; $40,000.00 on 8/31/00; $50,000.00 on 11/1/00; $40,000.00 on 12/1/00; $50,000.00

8

on 2/6/01; $20,000.00 on 2/7/01; $62,000.00 on 3/6/01; $70,000.00 on 4/2/01; $60,000.00 on 5/2/01; and $70,000.00 on 6/01/01). At the time of the transfers, Jacuzzi was not a creditor of Plaintiffs or an investor in Plaintiffs.

## V.

## CAUSES OF ACTION

### A. <u>Fraudulent Transfer</u>

14. Trustee adopts the allegations of paragraphs 1 through 13 herein.

15. At the time of the transfers to Jacuzzi, Plaintiffs were insolvent, with virtually no assets and near or over $100 million in debt by IFS itself, without consideration of the $10's if not $100's of millions of debt due by its affiliated Interamericas Companies to third parties. In exchange for the transfer to Jacuzzi, Plaintiffs received nothing in exchange. Jacuzzi was neither a creditor nor investor in Plaintiffs. At the time of and following the fraudulent transfers to Jacuzzi and others, all accomplished within the same time period, Plaintiffs had no business and no assets.

16. The principals of the Interamericas Companies, which included IFS, intended to defraud the creditors of the Plaintiff Debtors by the transfers to Jacuzzi. As is alleged hereinafter, Jacuzzi was aware of this fraudulent intent.

17. Pursuant to 11 U.S.C. § 544 and Tex. Bus. & Comm. Code Ann, §§ 24.005 and 24.006, the transfers to Jacuzzi are avoidable as fraudulent transfers and should be avoided.

### B. <u>Fraud, Aiding and Abetting Fraudulent Transfer/Conspiracy</u>

18. Trustee adopts the allegations of paragraphs 1 through 17 herein.

9

19. Jacuzzi knew of the fraudulent intent of the principals of the Interamericas Companies, including Plaintiffs, to defraud the creditors of Plaintiffs, knew Jacuzzi had no legitimate claims to the payments complained of and conspired with those principals and aided and abetted those principals to commit the conversion, misappropriation and denuding of Plaintiffs to the benefit of Jacuzzi. The objects to be accomplished were the concealment/conversion of Plaintiffs' assets, misappropriation of Plaintiffs' assets and denuding of Plaintiffs to the unjust enrichment of Jacuzzi and in fraud of the creditors of Plaintiffs.

20. There was a meeting of the minds on each of the objectives and/or course of action. The acts complained of were unlawful. Even if the scheme is found to be legal, the scheme was carried out by the conspirators by unlawful means (and in violation of Judge Rosenthal's injunction prohibiting dissipation of assets by IFS). As a result, IFS and their creditors and their estates were severely damaged.

21. Such acts were intentional and in furtherance of the conspirators' goals and done with knowledge that such conduct was illegal and done maliciously with knowledge that such conduct injured Plaintiffs and their creditors.

22. Based upon the foregoing, Jacuzzi is liable for conspiracy and liable for the damages caused.

C. **Punitive Damages**

23. Trustee adopts the allegations of paragraphs 1 through 22 herein.

24. The willful, callous and/or reckless indifference to the acts which led to Plaintiffs' and their creditors' losses warrant assessment of punitive damages against Jacuzzi.

10

WHEREFORE, premises considered, Trustee prays for judgment against John Bruno Jacuzzi Rainieri as requested herein, and that he be granted such other and further relief as is just.

DATED: October 11, 2004.

                            Respectfully submitted,

                            W. STEVE SMITH, P.C.

By: */s/W. Steve Smith*
    W. STEVE SMITH
    State Bar No. 18700000
    BLANCHE D. SMITH
    State Bar No. 00783991
    2015 Crocker Street
    Houston, Texas  77006
    Telephone:  (713) 533-1833
    Facsimile:   (713) 533-1834
    ATTORNEYS FOR TRUSTEE